MRS. C. on her own behalf and as mother and guardian on Behalf of J.C., Plaintiff–Appellant,

v.

Amy WHEATON, Commissioner, State of Connecticut Department of Children and Youth Services, et al., Defendants–Appellees.

No. 123, Docket 90–7289.

United States Court of Appeals, Second Circuit.

Argued Aug. 30, 1990.

Decided Oct. 16, 1990.

Douglas M. Crockett, Conn. Legal Services, Willimantic, Conn. (Bet Gailor, Protection & Advocacy, Hartford, Conn., Margaret Zerhan, Conn. Legal Services, Bridgeport, Conn., of counsel), for plaintiff-appellant.

Ralph E. Urban, Asst. Atty. Gen. of State of Conn., Hartford, Conn. (Clarine Nardi Riddle, Atty. Gen. of State of Conn., John R. Whelan, Asst. Atty. Gen., of counsel), for defendants-appellees.

Before FEINBERG and CARDAMONE, Circuit Judges, and RE, Chief Judge.*

FEINBERG, Circuit Judge:

Plaintiff Mrs. C., who sues on behalf of herself and J.C. as his parent and legal guardian, appeals from an order of the United States District Court for the District of Connecticut, José A. Cabranes, J., dismissing Mrs. C.'s complaint against defendants Connecticut Department of Children and Youth Services (the Department) and its Commissioner, the Department's Unified School District II and its Superintendent, and the Connecticut State Board of Education and its Commissioner. The complaint alleges in relevant part that defendants, in terminating J.C.'s educational placement, violated the Education of the Handicapped Act, 20 U.S.C. § 1400 et seq. (EHA), section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and due process; the complaint seeks declaratory relief and compensatory education. The district court held that appellees were not required to comply with EHA procedural safeguards before terminating J.C.'s special education program because he had reached the age of majority (18) and was not an adjudicated incompetent, and had agreed to the termination. The district court also held that J.C.'s claim for declaratory relief was moot because an individual over the age of 21 has no right to a free public education, and the one exception to this rule, compensatory education awarded after gross violation of the EHA, did not apply. The court accordingly found no statutory or due process violation and dismissed the complaint. For reasons given below, we reverse the judgment of the district court.

## Background

J.C. is a functionally retarded, learning-disabled 22–year old. A psychiatric assessment found that J.C., at age 20, faced a marked deficit in adaptive behavior and functioned on the average like a 10– or 11–year old.

The background leading to the termination of J.C.'s educational program, according to the complaint and other documents before us, is as follows. J.C. was adopted by his maternal grandparents, but they were unable to continue to provide a home for him. At age four, J.C. was committed to the custody of the Department. The Department placed J.C. in various institutions throughout his childhood, and in 1985 placed him at the Eagleton School (Eagleton), a private school in Massachu-

* Honorable Edward D. Re, Chief Judge, United States Court of International Trade, sitting by designation.

setts. J.C. remained at Eagleton until August 1988, at which point he was 20-years old.

In July 1988, a Department worker went to a meeting at Eagleton, in his words, "to suggest a firm discharge plan for J.C." At the meeting, school staff described J.C. as "more destructive to property and ... becoming more and more unmanageable." J.C. expressed his desire during the meeting to live with his natural mother, Mrs. C., but some of those present at the meeting stated that they would not recommend that J.C. be placed in her custody. The Department social worker and J.C. reached an agreement to terminate J.C.'s placement at Eagleton in August 1988, and the Department informed Mrs. C. that it was discharging J.C. into her custody. The Eagleton discharge summary states that the Department placed J.C. with Mrs. C., because "at present a transitional living program has not been found [for J.C.]."

Since J.C. was a ward of the state, a surrogate parent had been appointed for him to represent him in the decision-making process concerning his special education.[1] After J.C.'s placement at Eagleton was terminated, Mrs. C. was appointed as J.C.'s conservator. The termination of J.C.'s placement occurred without the involvement of J.C.'s surrogate parent or his mother, neither of whom was provided with notice or an opportunity to participate in the termination decision.

Mrs. C. challenged the termination in an administrative hearing conducted by the Connecticut State Board of Education. The hearing officer held that J.C. had himself terminated his educational placement at Eagleton and was not entitled to compensatory education. Mrs. C. then brought this action in the district court, appealing the hearing officer's decision and seeking the relief described above. Upon defendants' motion, the court dismissed the complaint, holding that J.C.'s rights had not been violated.

### Discussion

#### A. *The EHA Claim*

■ Congress enacted the EHA in response to the wholesale exclusion of handicapped children—particularly those who were emotionally disturbed—from education programs. *Honig v. Doe*, 484 U.S. 305, 309, 108 S.Ct. 592, 596, 98 L.Ed.2d 686 (1988). The EHA provides federal funds to states that promise to provide at minimum a "free appropriate public education" for all handicapped children within the state. 20 U.S.C. § 1412(1). Connecticut has chosen to participate in the EHA and has enacted legislation to implement the Act's requirements. See Conn.Gen.Stat. § 10–76h. For handicapped children between the ages of 18 and 21, inclusive, the state need not provide a free educational placement if it would be inconsistent with state law or practice. See 20 U.S.C. § 1412(2)(B). Under Connecticut law, a handicapped student already under the care of the Department retains eligibility for placement until reaching his twenty-first birthday if he remains voluntarily and the Commissioner of the Department, in his discretion, decides that the student would benefit from further care and support of the Department. Conn.Gen.Stat. § 17–419(d).[2]

---

1. Section 10–94g(a) of the Connecticut General Statutes provides:

> (a) When in the opinion of the commissioner of education or a designee of said commissioner, a child may require special education and the parent or guardian of such child is unknown or unavailable or such child is a ward of the state, the commissioner or a designee of said commissioner shall appoint a surrogate parent who shall represent such child in the educational decision-making process.

2. Section 17–419(d) of the Connecticut General Statutes provides in relevant part:

> [A]ny person already under the care and supervision of the commissioner of the department of children and youth services who has passed his eighteenth birthday but has not yet reached his twenty-first birthday, may be permitted to remain voluntarily under the supervision of the commissioner, provided said commissioner, in his discretion determines that such person would benefit from further care and support from the department of children and youth services.

The EHA imposes a number of procedural requirements on participating states in order to safeguard a student's right to education. 20 U.S.C. § 1415; *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 182–84, 102 S.Ct. 3034, 3038–39, 73 L.Ed.2d 690 (1982). The procedural safeguards "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig*, 484 U.S. at 311–12, 108 S.Ct. at 597–98.

The EHA procedural safeguards begin with the individualized education program (IEP). "The Act contains a strong focus on involving the handicapped child's parents, teacher, and a representative of the local educational agency in the formulation of an [IEP] tailored to the particular needs of the handicapped student." *Mrs. W. v. Tirozzi*, 832 F.2d 748, 751 (2d Cir.1987). The IEP must specify the instructional goals and objectives, any special services to be provided and criteria for progress evaluation. See § 1401(19).

If there is any proposed change in a child's IEP, the parent or guardian must be so notified in writing, § 1415(b)(1)(C), and provided with an opportunity to bring complaints about "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," § 1415(b)(1)(E). The parent or guardian then has a right to contest the matter in an impartial due process hearing conducted by the state educational agency. § 1415(b)(2). During the pendency of these proceedings, the child must be allowed to remain in his current educational placement under the "stay-put" provision of the Act, § 1415(e)(3), unless the parent or guardian otherwise agrees.

Any party who is "aggrieved by the findings and decision" of the state administrative hearing may bring an action in state or federal court. § 1415(e)(2). A party may thus seek redress in the federal courts for the state's failure to provide any of the EHA procedural safeguards. See, e.g.,

*Burr by Burr v. Ambach*, 863 F.2d 1071, 1076 (2d Cir.1988), vacated sub nom. *Sobol v. Burr*, —— U.S. ——, 109 S.Ct. 3209, 106 L.Ed.2d 560 (1989), reaff'd, *Burr by Burr v. Sobol*, 888 F.2d 258 (2d Cir.1989), cert. denied, —— U.S. ——, 110 S.Ct. 1298, 108 L.Ed.2d 475 (1990). This is because there is an enforceable substantive right to a "free appropriate public education," 20 U.S.C. § 1400(c); *Tirozzi*, 832 F.2d at 751, and such an education must satisfy the IEP requirements and other EHA procedural safeguards, *Rowley*, 458 U.S. at 203–07, 102 S.Ct. at 3049–51.

The complaint alleges that defendants terminated J.C.'s educational placement at Eagleton without complying with any of the EHA procedural safeguards, including the "stay-put" provision. Neither J.C.'s mother nor his surrogate parent was provided with notice of the change in J.C.'s placement and there was no IEP meeting discussing the termination. The complaint also alleges that J.C. "lacked the capacity" to make the termination decision on his own.

The district court found that the allegations of the complaint did not amount to a claim that J.C. was, as a matter of law, legally incompetent to make such a decision, since J.C. admittedly was over the age of majority when the termination decision was made, and was not an adjudicated incompetent. The district court then dismissed the EHA claim after holding that the EHA procedural safeguards such as the "stay-put" provision are not applicable when a legally competent adult chooses to leave an institution.

Appellant argues that the district court erred in dismissing the complaint because it clearly stated a claim for relief under the EHA, and the district court improperly relied on disputed facts in reaching its conclusions. Appellees contend that the district court properly held, on the record before it, that the complaint failed to state a cause of action under the EHA because J.C. was a legally competent adult at the time he agreed to depart from Eagleton.

The basic issue before us is whether the state must comply with EHA procedural

safeguards before it terminates the educational placement of a handicapped student, who is between the ages of 18 and 21, on the basis of the student's consent. The district court assumed that because an individual over the age of 18 who is not an adjudicated incompetent is "legally competent" under state law, the Department only needed J.C.'s voluntary consent in order to terminate his educational placement and the procedural requirements of the EHA no longer applied. We believe, however, that this assumption is incorrect.

The EHA indicates that consent is unrelated to the standard for legal competency adopted by the district court. The Act refers to "children" up through 21 years of age. See 20 U.S.C. § 1412(2)(B). As already indicated, the parent or guardian must be notified in writing of any proposed change—which would include termination—in the student's placement, and if the parent or guardian complains of the change and seeks review of the decision, the "stay-put" provision becomes operative. Once that occurs, only a parent or guardian can waive that provision. Id. Moreover, the regulations issued by the United States Department of Education, pursuant to the EHA, make clear that if a state provides education to an 18- to 21-year old handicapped child—and Connecticut does, see note 2 supra—the requirements of the EHA apply. See 34 C.F.R. § 300.300(b)(4).

Thus, the statute and the relevant regulations contemplate that EHA procedural safeguards apply to an 18- to 21-year old even though there has been no adjudication of incompetency. Indeed, Congress enacted the procedural safeguards in order to "guarantee parents ... an opportunity for meaningful input into *all* decisions affecting their child's education." *Honig*, 484 U.S. at 311, 108 S.Ct. at 597 (emphasis added).

Appellant points out that had there been such participation here at an IEP meeting, there could have been informed discussion of the unsuitability of Mrs. C.'s apartment, the danger to J.C. of stopping his educational program and the possibility of a trial diagnostic placement with Mrs. C. that would have preserved J.C.'s placement at Eagleton as a fall-back position. Or there could have been discussion concerning J.C.'s placement at a residential transitional living facility in the form of a group home where J.C. could begin to learn to live outside of an institutional setting. At the very least, J.C.'s surrogate parent, concerned with protecting J.C.'s interests, could have advised him that leaving Eagleton to go back to Mrs. C. was not a good idea. Such a meeting, however, was never held, and J.C. left Eagleton and moved in with his mother. Thereafter, as could have been foreseen, Mrs. C. was unable to control J.C. and lacked the skills and facilities to care for him properly. Within a few weeks the living arrangement fell apart. A family services agency placed J.C. in a structured group home, which lasted 24 hours. J.C. then moved into a homeless shelter and a series of temporary living arrangements. Finally, J.C. began supporting himself as a prostitute on the streets of Bridgeport. J.C.'s exclusion from special education without compliance with EHA procedural safeguards thus frustrated precisely what Congress sought to achieve by enacting the EHA.

Moreover, the EHA incorporates state substantive standards as the governing federal rule only if they are consistent with, and at least as exacting as, the EHA provisions. *David D. v. Dartmouth School Committee*, 775 F.2d 411, 422 (1st Cir.1985), cert. denied, 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986); *Amelia County School Board v. Virginia Board of Education*, 661 F.Supp. 889, 893–94 (E.D.Va.1987). Thus, even if the Connecticut substantive standard defined consent for purposes of waiving EHA procedural safeguards in terms of "legal competency," such a standard could not govern here because it would be less exacting than the federal provisions since it does not require parental involvement.

For the above reasons, we hold that the state must comply with EHA procedural safeguards before it terminates, on the basis of consent, the educational placement of a student. In the absence of such proce-

dures, the student's "consent" is ineffective.[3] Appellees argue that this holding may force a state to keep a legally competent adult in an educational placement against his will because of the effect of the "stay-put" provision, which can only be waived by the parent or guardian. Appellees argue that this conflicts with the right of an 18- to 21-year old who is legally competent to decide to leave the placement. In light of our ruling here, however, any possible conflict in this regard can only arise after the 18- to 21-year old has been properly advised before deciding whether to agree to the termination. Our holding is that the *state* cannot terminate an 18- to 21-year old student's educational placement on the latter's *"consent"* unless the "consent" is an informed one, i.e., the EHA procedural safeguards are followed. If such a properly advised student then decides to leave, we leave open what would happen thereafter. We are not convinced that even then a conflict would exist, but we leave the resolution of that problem for another day.

B. *The Rehabilitation Act Claim*

▉ It is settled in this circuit that the Rehabilitation Act implicitly creates a private right of action directly against the recipients of federal funds. *Doe v. New York University*, 666 F.2d 761, 774 (2d Cir.1981); *Kampmeier v. Nyquist*, 553 F.2d 296, 299 (2d Cir.1977). To establish a prima facie violation of § 504, a plaintiff must prove: (1) he is a "handicapped person" under the Rehabilitation Act; (2) he is "otherwise qualified" for the program; (3) he is excluded from benefits solely because of his handicap; and (4) the program or special service receives federal funding. *Joyner by Lowry v. Dumpson*, 712 F.2d 770, 774 (2d Cir.1983).

▉ The district court did not address appellant's § 504 claim and apparently dismissed it solely on the ground that the complaint did not state a claim for compensatory education since J.C. voluntarily agreed to the termination of his educational placement. Appellees challenge the sufficiency of the § 504 claim, arguing that J.C.'s consent to the termination means he was no longer qualified for the program.

An "otherwise qualified" handicapped individual is one "who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979). We concluded above that because the Department failed to follow EHA procedures, J.C.'s "consent" to the termination was not effective. Thus, J.C.'s "consent" does not, as appellees argue, mean that J.C. is not "otherwise qualified" within the meaning of § 504. Appellant points to a number of allegations in the complaint that she believes satisfy the elements necessary to make out a prima facie violation of § 504, and appellee does not dispute that those allegations sufficiently state a § 504 claim. Providing appellant with the favorable inferences that can be drawn from the allegations in the complaint, as we must in the procedural posture of this appeal, we find that the complaint states a claim for relief under § 504.

C. *Due Process and the § 1983 Claim*

Appellees argue that since J.C. was a legally competent adult who voluntarily chose to relinquish a constitutionally protected property right, the complaint does not state a claim under § 1983 because there was neither state action nor a "taking" by the state defendants of J.C.'s property interest in his educational program. Since we found above that J.C.'s "consent" was ineffective because EHA procedures had not been followed, appellees' argument is without merit.

---

**3.** This holding does not conflict with the right of the Commissioner to terminate an 18- to 21-year old's placement if the Commissioner in his discretion determines that the student would not benefit from the state's further care and support. See note 2 supra. On the record before us, the state terminated J.C.'s placement on the basis of J.C.'s consent and not because the Commissioner exercised his discretion and decided J.C. would no longer benefit from the placement.

The district court apparently dismissed the due process claim on the ground that J.C. had been given all the process that was due in the administrative hearing conducted after the termination. Appellant makes a strong case that under *Zinermon v. Birch*, —— U.S. ——, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), due process requires adherence to EHA procedural safeguards before the state can terminate the educational placement of a mentally handicapped student even if the termination is initiated by the student. Appellant did not make this argument to the district court, since *Zinermon* was decided shortly before the district court's ruling. Although we recognize the persuasiveness of appellant's position, it is not necessary for us to consider it. We have already held that J.C. was entitled to the procedures set forth in the EHA. Since appellant asks for no more than that, there is no need to reach the constitutional question and we decline to do so.

### D. *Compensatory Education and Sovereign Immunity*

■ The district court dismissed appellant's claim for compensatory education for J.C. on the ground that the claim did not fall within the narrow category of cases in which a court may provide the remedy of compensatory education for individuals over the age of 21, citing *Burr by Burr v. Ambach*, 863 F.2d 1071 (2d Cir.1988) (Burr I), vacated sub nom. *Sobol v. Burr*, —— U.S. ——, 109 S.Ct. 3209, 106 L.Ed.2d 560 (1989), reaff'd, *Burr by Burr v. Sobol*, 888 F.2d 258 (2d Cir.1989) (Burr II), cert. denied, —— U.S. ——, 110 S.Ct. 1298, 108 L.Ed.2d 475 (1990). In *Burr I*, we recognized that "a handicapped child does not have a right to demand a public education beyond the age of twenty-one," 863 F.2d at 1078, but found that compensatory education was proper in that case because the EHA regulations were "grossly violated," id. at 1075, which resulted in exclusion of the student from school for a substantial period of time.

In light of our determination that the Department was required to follow EHA procedures before terminating J.C.'s educational placement, the complaint clearly alleges violations of the EHA that led to J.C.'s exclusion from his educational placement. Moreover, a comparison of appellant's allegations with the violations we found in *Burr I* shows that compensable education is an appropriate remedy here. The "gross violations" we found in *Burr I* consisted of undue delay in an agency hearing and in administrative review thereafter in violation of the EHA and applicable regulations in a situation where the handicapped child was being deprived of the benefit of the "stay-put" provision of the EHA because his former school had closed. Thus, in *Burr I* the failure to comply with EHA procedures completely deprived the student of an educational placement until he was 21. Here, appellant alleges that defendants in effect took advantage of J.C.'s mental infirmities in order to evade EHA procedures, resulting in J.C.'s complete exclusion from an educational placement until he was 21, with disastrous results. We believe that the complaint states a claim for compensatory educational relief.

■ Appellees argue that an award of compensatory education would in any event be barred by the Eleventh Amendment, since the award will require state expenditures. It is true that the EHA does not abrogate a state's sovereign immunity. *Dellmuth v. Muth*, —— U.S. ——, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989). However, Congress amended the EHA in 1986 so that the EHA no longer provides the exclusive avenue through which a plaintiff may assert an EHA claim. 20 U.S.C. § 1415(f); see generally *Mrs. W. v. Tirozzi*, 832 F.2d 748, 754–55 (2d Cir.1987). In particular, "§ 504 ... may be used as [a remedy] to enforce EHA educational rights, subject to the Act's existing exhaustion requirements." *Tirozzi*, 832 F.2d at 751. As we held in *Burr I* and *Burr II* and hold again today, compensatory education is a proper remedy in an appropriate situation for enforcing EHA educational rights. Since § 504 expressly allows for equitable relief, 42 U.S.C. § 2000d–7(a)(2), compensatory education is an appropriate remedy when

**76**

§ 504 is used to enforce EHA rights. If the district court were to provide an award of compensatory education as a remedy under § 504, the Eleventh Amendment would pose no bar since there is no state immunity for violations of § 504. 20 U.S.C. § 2000d–7(a)(1).

Under well-recognized doctrine, we should not consider a constitutional claim unless it is necessary to do so. See, e.g., *Burr I*, 863 F.2d at 1075. Accordingly, we do not reach the question whether an award of compensatory education under the EHA on these facts runs afoul of the Eleventh Amendment. See *Burr II*, 888 F.2d at 259 (affirming such an award subsequent to *Muth*, in part because the relief was "prospective in nature, and any effect on the state treasury would be ancillary to such relief and therefore permissible under the Eleventh Amendment").

We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.